IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EMMANUEL E. SEWELL | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v | * | Civil Action No.  DKC-11-614 |
| | * | (Consolidated Case: DKC-11-632) |
| J. MICHAEL STOUFFER, et al. | * | |
| | * | |
| Defendants | * | |
| | *** | |

**MEMORANDUM OPINION**

Pending in the above-captioned consolidated cases are Plaintiff's Motion for Preliminary Injunction (ECF No. 41) and Defendants' Motions to Dismiss or for Summary Judgment. ECF Nos. 60 and 61. Plaintiff opposes the dispositive motions and moves for summary judgment in his favor. ECF No. 63. Defendants have opposed Plaintiff's motion. ECF No. 67 and 68. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

**Background**

Plaintiff asserts he was retaliated against by Defendants after litigating a case in this court. ECF No. 1, *see also Sewell v. Rowley, et al.*, DKC-09-693 (D. Md.). He states that after the case was dismissed for failure to exhaust administrative remedies, he pursued those remedies and obtained a hearing in the Circuit Court for Allegany County on March 25, 2011. He asserts he was forced to abandon the matter because staff members at North Branch Correctional Institution (NBCI) were tampering with his food by lacing it with Salmonella and placing sharp objects in his "fish diet" on two occasions. He further claims that his access to the law library was unconstitutionally restricted, and his legal mail was unlawfully opened and discarded. He

further claims he was given an overdose of insulin resulting in a permanent disfigurement of his throat which he believes to be cancer. ECF No. 1 at pp. 1 – 2.[1]

In his amended complaint, Plaintiff states that on February 28, 2010, he became violently ill after he was intentionally poisoned with "cocktails of diabetic and blood pressure" medications as well as medicines for cholesterol.  He claims he suffered permanent disfigurement of his throat and neck with internal injuries from vomiting, hot sweats, abdominal pains, burning of the throat, nausea, tremors, and unknown internal injuries. ECF No. 6 at p. 13. Officers Girvin and Deist escorted Plaintiff to the medical corridor for treatment of his illness, but Plaintiff claims Registered Nurse Steven Bray just "looked at the injury" and told Plaintiff he would have to see the doctor. *Id*.  Plaintiff claims he asked Bray for something to treat the burning and vomiting but he refused to provide it.  Plaintiff claims that, as a result, he was forced to suffer for over 20 days (until March 18, 2010) when he was seen by Dr. Majid Arnaout. Plaintiff states he was "prevented from eating for over two weeks" and all sick call requests were ignored.

When Plaintiff was seen by Dr. Arnaout he explained to him that he had been diagnosed diabetic by Dr. Oteyza in 2009, but Arnaout's search of the computer returned no indication of that diagnosis.  Plaintiff suggests that the incorrect diagnosis by Oteyza, together with Oteyza's abrupt disappearance, is evidence of a conspiracy intentionally to deprive Plaintiff of "life and liberty without due process of law." *Id*. at p. 14.  Plaintiff further claims he was seen by MaryJoe Sabattelli, Director of Treatment Services, on June 23, 2010, who interviewed him and observed a blood clot six to seven inches long and one and one-half to one and three-quarter

---

[1] All page numbers referenced for court documents refer to CM-ECF pagination.

inches thick in his throat.  He states that after she "submitted the claim" regarding his throat injury, she also disappeared.  *Id*.

Plaintiff claims that, on July 27, 2010, the Warden provided a late response to his administrative remedy regarding his injuries and his September 2009 blood values which failed to address his injuries.  He asserts the blood test results indicated that he should never have received Metformin, Norvasc, Lisinipril, HCTZ, and Zocor.[2]  *Id*. at p. 14.  Plaintiff further claims the Commissioner's response on September 29, 2010, was "a misrepresentation of the factual allegations."  He further alleges that there has been a pattern of breaching the constitutional duty to provide a safe prison environment resulting in "multiple life threatening" injuries.  *Id*. at p. 15.  Plaintiff states that the Inmate Grievance Office (IGO) also improperly failed to address his complaint and waited for over 150 days to find an arbitrary excuse to deny a remedy.  *Id*.

As further proof of the conspiracy to poison him, Plaintiff states all of his referrals to Dr. Summerfield, an optometrist, were derailed in order to cover up the fact that blunt force trauma was the cause of his "permanent disfigurements and loss of sight."  Additionally he claims records were falsified to make it look as if he were being prescribed glasses for diabetes on January 6, 2010.  *Id*.

Plaintiff also claims the psychology staff at NBCI discriminated against him as an African American by denying him access to programs.  ECF No. 6 at p. 16.  Dr. Holwager, Laura Moulden, Lt. Harbaugh and Warden Shearin denied Plaintiff's participation in the Behavioral

---

[2] Metformin is a medication used to treat Type II diabetes; it helps to control blood sugar. Norvasc is a calcium channel blocker; it affects the amount of calcium found in the heart and muscle cells. Lisinopril is used to treat high blood pressure and heart failure; it is also used to protect the heart immediately after a heart attack.  *See* http://www.bing.com/health/article/goldstandard.  HCTZ is a diuretic that helps prevent the body from absorbing too much salt and is used in people with congestive heart failure, cirrhosis of the liver, or kidney disorders.  *See* http://www.drugs.com/hctz.html.  Zocor is a statin drug used to lower the level of cholesterol and triglycerides in the blood which may also be used to reduce the risk of heart attack, stroke, or other health problems in patients with risk factors for heart or blood vessel disease.  *See* http://www.bing.com/health/article/goldstandard.

Management Program (BMP) and the Special Management Unit (SMU) because he did not meet the criteria for participation. Plaintiff states there have been no reasonable measures to include mentally ill inmates who are non-combative into psychological programming. Instead, Plaintiff claims, they are forced to suffer idleness and prolonged isolation and forego recreation, visits, and showers. *Id*. at p. 17. Inmates who are gang members, informants or who have excessive segregation sentences are granted special treatment over inmates like Plaintiff. *Id*. Plaintiff further claims that the other prisoners selected for participation in these programs are also granted special privileges regarding the type of property they are allowed to have. He states the difference in treatment between him and the inmates participating in the programs is totally without penological justification. He further asserts these Defendants failed to respond his ARP complaints regarding this matter. *Id*. at p. 18.

On December 7, 2010, Plaintiff complained about legal mail being opened and discarded. He also complained that Lt. Durst, Sgt. Bulger, and Sgt. McKenzie failed to provide "manner of records" regarding legal mail which was opened outside of his presence, including mail from this court dated March 16, 2011. ECF No. 6 at p. 18. Plaintiff states he received the mail from this court on March 18, 2011 and Officer Cruz failed to provide a "manner of record" regarding legal mail which was delivered with the seal broken. He alleges Officer Crowe also would not assist him in the matter. Plaintiff alleges that on an unspecified date "J.A. Kennell" gave his personal mail to a gang member in order to accomplish the goal of having Plaintiff "beef" with prison gangs.

On December 25, 2010, Plaintiff filed an ARP complaint with the Commissioner of Correction because while he was litigating a case in this court[3] he was being poisoned with Salmonella and sharp objects were being placed in the fish he was being served. ECF No. 6 at p. 19. Because the Division of Correction failed to process and investigate Plaintiff's claim, he was required to alert the Clerk of the Fourth Circuit Court of Appeals of the "extremely dangerous" conditions of confinement. Ultimately, Plaintiff states he had to abandon the appeal in order to relieve the "temporarily unsafe prison conditions." *Id*.

On December 27, 2010, Plaintiff claims he filed another complaint with the Commissioner because his "satellite library access was being completely restricted in terms of receiving case law and updated law changes for a liberal pleading in state court concerning excessive deadly force, denied medical care, and SMU operations." ECF No. 6 at pp. 19 - 20. He states that library services were only coming every two to three weeks and his request slips were being re-written in someone else's handwriting. Plaintiff further claims he was the target of multiple threats of death, food-poisoning, and mail fraud, in addition to complete denial of law library services. He again claims sharp objects were placed in his food, but the Warden, the Commissioner and the Unit Manager were indifferent to his need for immediate removal from the danger. *Id*. at p. 20.

Plaintiff claims multiple false infractions were used to increase his segregation time, deny him showers, and maliciously destroy his property. Additionally, Plaintiff states the false statements were used to revoke earned good conduct and special project credits. ECF No. 6 at p. 20. Plaintiff seeks both monetary and injunctive relief.

---

[3] Plaintiff references Civil Action DKC-09-693 and Fourth Circuit Court of Appeals case number 10-6463. ECF No. 6 at p. 19.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to….the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

While this case was pending Plaintiff filed a Motion for Injunctive Relief.  *See* ECF No. 41 -- 44.  This court directed counsel to file a response to the allegations raised.  ECF No. 45 and 48.  Plaintiff claimed that he was being denied his medically prescribed cardiovascular diet; that sharp objects were being put into his food; and that his legal mail was being intercepted or improperly opened.  ECF No. 42.  In addition to the allegations raised by Plaintiff, the court directed Defendants to provide information regarding his current mental health treatment. ECF No. 45.  Because the Motion for Injunctive Relief addresses claims essentially identical to those raised in the Complaint, the Responses to Show Cause and Plaintiff's Reply thereto will be considered in the context of the dispositive review of this case.

### Medical Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "[S]crutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S.

825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "[T]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "[A]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

With regard to Plaintiff's medically prescribed diet, Defendants Flury, Gilmore, Bray and Africa (medical Defendants) state that a cardiovascular diet was ordered for Plaintiff to treat his hypertension, hyperlipidemia (high cholesterol), hypothyroidism, and chronic renal dysfunction. ECF No. 55 at Ex. A. The diet ordered is low in salt and fats. Plaintiff refused the cardiovascular diet on June 30, 2009, choosing instead to sign up for a vegetarian diet. *Id.* On December 23, 2009, Plaintiff requested a 2400 calorie diabetic diet and his request was granted

on December 30, 2009. *Id*. On July 6, 2010, Dr. Majid Arnaout put Plaintiff back on the cardiovascular diet and discontinued a prescription for Glucophage.[4] The cardiovascular diet order was renewed on July 1, 2011, and will remain in effect until July 17, 2012. *Id*, *see also* ECF No. 50 at Ex. 3, pp. 2 – 3.

Medical Defendants assert that Plaintiff was prescribed and administered medications to treat his various medical conditions, but he often refuses the medications, tests, and appointments with health care staff. Because he refuses to allow medical staff to evaluate him, Plaintiff's medication prescriptions have not been renewed. ECF No. 61. Plaintiff's conditions were treated with: propranolol (a diuretic for treatment of hypertension); Zocor (for elevated cholesterol levels); hydrochlorothiazide (HTCZ a diuretic for treatment of hypertension); and Ecotrin (enteric-coated aspirin to prevent formation of blood clots). *Id*. at Ex. C, p. 3. On December 22, 2009, Plaintiff's hypertension medication was changed to Norvasc and Zestril. *Id*. at Ex. E, pp. 4 and 8.

To address his Type II Diabetes, Plaintiff's blood glucose level was monitored and when it was elevated on September 11, 2009, he was prescribed Glucophage, a medication that helps lower blood sugar. *Id*. at pp. 6 – 7. Despite the prescription, Plaintiff's glucose level remained elevated and on July 6, 2010, he confessed to Dr. Aranout that he stopped taking his medications for hypertension and diabetes in April of 2010. *Id*. at pp. 14 – 25. In light of Plaintiff's failure to take the prescribed medications, Dr. Arnaout discontinued the Glucophage and restarted Zestril and HCTZ at a lower dose. Plaintiff was scheduled for an evaluation on September 15, 2010, but failed to show up. On September 28, 2010, Plaintiff refused to have blood drawn for testing and, in the following month, refused to take his evening medications. *Id*. After complaining he was

---

[4] Glucophage is a medication that helps to lower blood sugar and is prescribed for Type II diabetes mellitus patients. ECF No. 55 at Ex. A.

not receiving proper medical care, Plaintiff was scheduled to see Physician's Assistant Flury on February 16, 2011. Plaintiff's complaints included allegations that the medical department had misdiagnosed his diabetes and prescribed medications that caused a neck rash and throat irritation. *Id*. at p. 26. Plaintiff initially refused to come to the medical unit to discuss his medical care, but was convinced to do so after Flury went to his cell and talked to him. *Id*. As a result of that meeting, Plaintiff agreed to allow medical staff to perform diagnostic tests necessary to monitor his medical conditions and gain some control over his chronic disease. Flury ordered tests to monitor Plaintiff's blood sugar levels on February 23, 2011, but Plaintiff refused the tests on February 28, March 3, and March 4, 2011. *Id*. at pp. 26 – 29 and 35 – 38.

With respect to Plaintiff's hypertension, his blood pressure was found to be elevated on February 24, 2011, but he refused to allow medical staff to check his blood pressure on February 25, and February 26, 2011. Additionally on April 15, April 23, and July 13, 2011, Plaintiff refused to attend the chronic care clinic appointments designed to monitor his chronic health conditions. Defendants state that Plaintiff continues to refuse to attend chronic care clinic appointments or to otherwise cooperate in his health care. *Id*. at pp. 30 – 34 and 39 – 48. In cases such as Plaintiff's where medical evaluation is refused, the prescription medications are not renewed. Plaintiff's medications expired on June 4, 2011, and have not been renewed because of his refusal to cooperate with medical staff.

When Plaintiff's allegations are viewed in the context of the medical evidence submitted, it is clear his issue with the medical care offered is based on his belief that staff are attempting to harm him. Despite a referral for mental health consultation made by Flury in an effort to determine if Plaintiff could be encouraged to cooperate in his health care, he continues to refuse. ECF No. 61 at Ex. E, p. 44. His disagreement with the manner in which his chronic health

conditions are treated is not a basis for an Eighth Amendment claim of deliberate indifference to a serious medical need. In his Opposition Response, Plaintiff asserts he is entitled to both medical and psychological care under Title II of the Americans with Disabilities Act[5] and the Due Process clause.[6] ECF No. 63 at p. 6. While it is true that Plaintiff is entitled to treatment of serious medical and psychological conditions, there is little to nothing that can be done when he refuses the treatment offered. In short, he is not entitled to dictate to medical staff what his care will involve.

Psychiatric Care

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *See Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

---

[5] 42 U.S.C. Section 12131 *et seq.*

[6] Plaintiff claims he has been excluded from participation in mental health care, medical care, "guaranteed safety," and protection from personal abuse and injury, due to his race and his disability. He claims his disability is "organic brain disorder" which he further defines as depression with bipolar tendencies. ECF No. 61 at p. 6. Plaintiff's claim of discriminatory exclusion fails in light of his undisputed refusal to cooperate with medical and psychology staff. A disabled individual is in fact entitled to "reasonable modifications" to enable the disabled person to receive services or participate in programs or activities. *See* 42 U.S.C. §12131(2) (2000). However, "the public entity is obligated to make those modifications that do not 'fundamentally alter the nature of the service or activity of the public entity or impose an undue burden.'" *Miller v. Hinton*, 288 Fed.Appx. 901, 902-903, 2008 WL 3849765, 1 (4th Cir. 2008), *quoting Bircoll v. Miami-Dade County*, 480 F. 3d 1072, 1082 (11th Cir. 2007). Requiring health care staff to bow to the whims of Plaintiff's misguided beliefs regarding conspiracies to harm him through allegedly improperly prescribed medication is not required as a reasonable modification.

Plaintiff's history of psychiatric treatment includes a prescription for an anti-depressant, amitriptyline. ECF No. 55 at Ex. A, pp. 4 – 7; Ex. B, pp. 4 – 9. Initially he was evaluated by Laura Booth on July 6, 2009, because he exhibited a flat affect and a withdrawal from interactions with others. Plaintiff claimed he was experiencing stress due to conflicts over medical attention and his belief a mistake had been made regarding the length of his sentence. Plaintiff was counseled to use coping skills and to focus on his goals.

Plaintiff was receiving psychotropic medication and on January 15, 2010, he submitted a request form stating his medication had been discontinued. He was evaluated and referred to the psychiatrist, Dr. Helz. In her evaluation of Plaintiff on February 24, 2010, Dr. Helz noted that Plaintiff has a history of numerous psychiatric hospitalizations, one of which followed a suicide attempt at age 18, but that Plaintiff was not currently experiencing signs of psychosis or mania. ECF No. 55 at Ex. B, p. 17. As a result of the evaluation, Dr. Helz put Plaintiff back on amitriptyline and noted he wanted to be seen by psychology. *Id*. at p. 18. On March 25, 2010, Plaintiff was again seen by psychology staff where he became argumentative because Booth did not agree with his assertion that he deserved special treatment and should not be confined to segregation. *Id*. at p. 20. Subsequent appointments were either refused by Plaintiff or degenerated into threats and accusations against staff. *Id*. at Ex. B, pp. 23 – 39. Ultimately, Plaintiff's regularly scheduled appointments with psychiatry and psychology staff were canceled because of his refusal of treatment. *Id*. at Ex. B, p. 40. Thus, it appears that any lapse in Plaintiff's psychological treatment is due to his decisions regarding same and is not the result of a denial of needed care by staff.

Conditions of Confinement

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) *citing Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), *quoting Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must

produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir.2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

With regard to the assertions that Plaintiff's food is being tampered with or otherwise altered, medical Defendants assert they are not charged with the responsibility of delivering food to inmates. Correctional Defendants assert that when Plaintiff's claims of food tampering were investigated there was no objective evidence discovered to support the claim. ECF No. 50 at Ex. 2. Plaintiff does not state whether the sharp objects found in his fish were fish bones, but describes them as thin and transparent. ECF No. 38 and 42. Parrish Kammauff, the Correctional Dietary Manager, asked Plaintiff if he could show him the sharp object he found in his food, but Plaintiff was either unwilling or unable to do so. ECF No. 50 at Ex. 2.

Plaintiff's claim regarding his mail is also addressed by correctional Defendants. All incoming legal mail at North Branch Correctional Institution (NBCI) is logged in and forwarded to the housing unit where the intended recipient is assigned. ECF No. 50 at Ex. 4. The "legal log book" maintained by NBCI staff contains the inmate-recipient's name and signature, reflecting his receipt of legal mail. Pages from the log book covering the period of time beginning June 30, 2010 through October 5, 2011, indicate that Plaintiff received legal mail sixty-five times. *Id*. at Ex. 4 and 7. There is no objective indication that legal mail intended for Plaintiff was diverted, destroyed or otherwise mishandled. To the extent that, on occasion, legal

mail was opened outside of Plaintiff's presence and in contravention to directives requiring legal mail to be opened in the recipient's presence, that fact alone does not establish a pattern or practice of deliberate mishandling of legal mail. Additionally, there is no indication that Plaintiff's ability to litigate meritorious claims has been impermissibly burdened.

Correctional Defendants acknowledge that since his transfer to NBCI on December 15, 2009, Plaintiff has been assigned to either administrative or disciplinary segregation. ECF No. 60 at Ex. 1. With respect to Plaintiff's claims that objects are being placed in his food, Defendants explain that there are twenty cardiovascular meals prepared for Plaintiff's housing unit. The meals are distributed randomly under the supervision of staff. *Id*. at Ex. 2. When Plaintiff complained about objects found in his food, he would not show those objects to Mr. Kammauff. When Plaintiff claimed an inmate-worker tampered with his food tray and removed food, his complaint was investigated. Plaintiff was informed that the trays are supervised by a dietary officer or a supervisor within the dietary department, making removal of food or tampering with it unlikely. In response Plaintiff requested that a supervisor personally bring him his tray, but his request was denied. *Id*. at Ex. 6. Plaintiff's assertions regarding his food service simply could not be verified. Indeed the claims he raises in opposition to Defendants' motions are as fantastic as those raised in the Complaint and are equally unlikely to be verifiable.

Plaintiff filed a Reply to Defendants' Responses to the Order to Show Cause. ECF No. 58. His Reply, however, simply levels more accusations of conspiracies to deprive him of mail or delay its delivery and claims that other inmates are being given his mail. He does not point to one instance of a missed deadline or other actual injury. He suggests that his mail is being dispersed at the nurse's station and claims his allegation can be proven via the recordings of the video monitors on the tier. *Id*. at p. 4. Plaintiff also asserts he has already established that he

was poisoned by medical staff when he was given the wrong medication and, as proof, he cites the fact that medication for diabetes was discontinued. *Id*. Additionally, he claims he is improperly confined to segregation based on false reports and claims there is no physical evidence to support the statements used against him. He states he was never a threat and prison officials are not acting rationally. *Id*. at p. 7. Plaintiff also maintains he is being poisoned by the midnight dietary staff who have persisted in contaminating his breakfast trays with Salmonella, using excessive seasoning that should not have been in his foods, opening his cereal, and putting one egg on his tray. *Id*. He adds that homemade knives ("shanks") are passed on the tier in order to have him killed and that there is food included on his tray that could give him a stroke or a heart attack. *Id*. at p. 8.

An injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To obtain injunctive relief, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, _U.S. _, 130 S.Ct. 2371, 176 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

While it is clear that Plaintiff's perception of a threat to his safety is quite real to him, there is no objective evidence to suggest that Defendants are ignoring his concerns or disregarding objective evidence of a serious threat of harm. His recent "Motion for Court's Intervention" confirms the extent of his fears, but also illustrates the problem with his claims. ECF No. 71. Plaintiff asserts theories of conspiracies against him; he believes there is a plot to

kill him either before he leaves the prison or after he is released; and he speculates that money has changed hands in order to insure he suffers a serious injury. *Id*. In addition, he reiterates his assertions that his mail is not being processed properly. *Id*. The speculative nature of his claims, together with the absence of any objective evidence to support them, precludes legal remedy. The resources of this court and of prison staff are simply not available to trace down every fantastic suspicion and conspiracy theory adduced by Plaintiff. He has failed to cite an actual injury emanating from the alleged tampering with his mail and offers no evidence to support an existing conspiracy against him. Thus, there is no legal basis to grant the injunctive relief requested, nor has Plaintiff established entitlement to judgment in his favor on the remaining claims against either correctional or medical staff.

Review of the record evidence establishes that Defendants are entitled to summary judgment on all of the claims raised by Plaintiff. A separate Order follows.

Date:   March 9, 2012                             /s/
                                        DEBORAH K. CHASANOW
                                        United States District Judge